IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DEMOCRATIC PARTY OF HAWAII, | ) ) ) | CIVIL NO. 13-00301 JMS-KSC |
| Plaintiff, | ) ) ) | ORDER (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; (2) DENYING |
| vs. | ) ) | PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; AND |
| SCOTT T. NAGO, in his Official Capacity as the Chief Election Officer of the State of Hawaii, | ) ) ) ) | (3) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| Defendant. | ) ) ) | |

**ORDER (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; (2) DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; AND (3) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

The court upholds Hawaii's open primary election against this facial

constitutional challenge.

The Democratic Party of Hawaii ("DPH") challenges the

constitutionality of Hawaii's open primary election, contending that article II, § 4,

of the Hawaii Constitution (and the Hawaii statutes that implement it) facially

violates the First Amendment of the United States Constitution by allowing voters

to select a political party's general-election candidates (other than a Presidential

candidate) without *publicly* declaring their affiliation with that party.  As explained to follow, a party's First Amendment right of free association includes the right to limit its association to people who share its views.  Arguing that association is a "two way street," the DPH contends that this right is severely burdened if a party does not know who is associating with it, and thus has no opportunity to restrict persons from participating in the nomination of a party's candidates.  Further arguing that Hawaii has no narrowly-tailored, compelling state interest justifying such a burden, the DPH seeks to prevent Defendant Scott T. Nago, in his official capacity as the Chief Election Officer of the State of Hawaii ("Nago" or the "State"), from administering this unconstitutional law any further.

Before the court are (1) Cross Motions for Summary Judgment; and (2) a Motion for Preliminary Injunction by the DPH seeking to enjoin Nago from enforcing or applying Hawaii's primary election laws in any way that violates the First Amendment.  Based on the following, the DPH's Motion for Partial Summary Judgment and Motion for Preliminary Injunction are DENIED.  The State's corresponding Motion for Summary Judgment is GRANTED.  The DPH's facial challenge fails.  Judgment shall issue in favor of the State.

## II.  <u>BACKGROUND</u>

### A.    **Factual Background**

Hawaii law requires candidates in any general election (except for a Presidential election) to be nominated in the preceding primary election.  *See* Hawaii Revised Statutes ("HRS") § 12-1 ("All candidates for elective office, except as provided in Section 14-21, shall be nominated in accordance with this chapter and not otherwise.")[1] & § 12-2 ("No person shall be a candidate for any general or special general election unless the person has been nominated in the immediately preceding primary or special primary.").  And article II, § 4, of the Hawaii Constitution requires these primary elections to be "open."[2]  That is,

---

[1]  HRS § 14-21, regarding the nomination of presidential electors, requires political parties to select such electors by "state party or group convention pursuant to the constitution, bylaws, and rules of the party or group[.]"  This action does not challenge § 14-21.

[2]  Generally, an "open" primary allows a person to vote without being "required to declare publicly a party preference or to have that preference publicly recorded."  *Democratic Party of the U.S. v. La Follette*, 450 U.S. 107, 111 n.4 (1981).  "The major characteristic of open primaries is that any registered voter can vote in the primary of [any] party."  *Id.* (quoting R. Blank, *Political Parties, An Introduction* 316 (1980)).  A voter, however, "is limited to that party's nominees *for all offices*.  [A voter] may not, for example, support a Republican nominee for Governor and a Democratic nominee for attorney general."  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 576 n.6 (2000).

Such an open primary differs from a "blanket" primary that allows a voter to choose "any candidate regardless of the candidate's political affiliation."  *Id*. at 570.  More specifically, a blanket primary is one "in which all candidates are combined on a single ballot and may be voted upon by voters affiliated with any party."  *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1178 (9th Cir. 2008).  In contrast, in a "closed" primary, "only persons who are members of the political party . . . can vote on its nominee."  *Jones*, 530 U.S. at 570.  And in a "semi-closed" primary, a party "may invite only its own registered members" as well as

(continued...)

Hawaii's Constitution provides that votes in a primary election must be cast

*without* requiring voters to "declare a party preference."

> Specifically, as amended in 1978, the Hawaii Constitution provides:
>
> The legislature shall provide for the registration of voters
> and for absentee voting and shall prescribe the method of
> voting at all elections.  Secrecy of voting shall be
> preserved; *provided that no person shall be required to
> declare a party preference or nonpartisanship as a
> condition of voting in any primary or special primary
> election.  Secrecy of voting and choice of political party
> affiliation or nonpartisanship shall be preserved.*

Haw. Const. art. II, § 4 (emphasis added).  This provision was ratified by Hawaii's

voters in November 1978, after delegates debated different types of primary

elections in the 1978 Constitutional Convention.  *See* Doc. No. 16-1, Nago Decl.

¶¶ 4, 5; II Proceedings of the Constitutional Convention of Hawaii of 1978 ("1978

Proceedings") 746-84 (1980).

> Prior to 1978, section 4 simply stated:  "The legislature shall provide

for the registration of voters and for absentee voting; and shall prescribe the

method of voting at all elections.  Secrecy of voting shall be preserved."  Haw.

Const. art. II, § 4 (1968).  And in the decade before the 1978 amendment to the

Hawaii Constitution, Hawaii utilized a "closed" primary based upon statute.  As

---

[2](...continued)
independent voters.  *Clingman v. Beaver*, 544 U.S. 581, 584 (2005).

4

amended in 1970, HRS § 12-31 provided in pertinent part:  "No person shall be

entitled to vote at a primary or special primary election who shall refuse to state his

party preference or nonpartisanship to the precinct officials, unless he wishes to

vote only for the board of education."  Further, county clerks kept records of a

voter's party designation, and a voter was restricted from voting in a different

party's primary in the next election cycle, unless "he has registered with the county

clerk to change his party to another party or to a nonpartisan designation" "not

later than 4:30 p.m. on the ninetieth day preceding the primary or special primary

election[.]"  *Id.*  County clerks also kept records of a new voter's party selection.

*See id*. ("In all primary or special primary elections the precinct officials shall note

the voter's party selection where the voter list indicates no previous party selection.

This information shall be forwarded to the county clerk.").

Many delegates at the 1978 Constitutional Convention voiced a clear

desire to eliminate the former closed primary system, with a goal of protecting the

privacy of a person's vote, and encouraging voter participation.  *See, e.g.*, II 1978

Proceedings 744 ("[A] large percentage of the electorate in Hawaii continues to

stay away from the polls because of discontent over the closed primary system.

Many people feel this is an invasion of their privacy, that it is repugnant to our

democratic process[.]") (statement of Delegate Campbell); *id*. at 766-67 ("An open

5

primary election operates to protect a person's voting and privacy rights . . . .  [A]s

the [closed-primary] system operates now, a voter must declare to a total stranger

his party preference at the time of registration and at the primary voting.")

(statement of Delegate Odanaka); *id.* at 768 ("[I]n the earlier days in this State, . . .

if you . . . went in and asked for the wrong ballot -- that would be a stigma attached

to you in your daily lives.") (statement of Delegate Blean).[3]

_____

[3] The 1978 Constitutional Convention's Committee of the Whole reported as follows in recommending adoption of the amendment:

> . . . No longer will prospective voters have to register as a Democrat, Republican or nonpartisan.  However, voters will still be required to vote only for candidates of one political persuasion.  Therefore, any person who votes for candidates in both the Republican and Democratic primary shall not have his vote counted.
>
> Your Committee believes that this change is warranted to encourage voters with minimal party affiliation or those without any party affiliation to participate in the electoral process.
>
> Implementation is left to the appropriate body but your Committee wishes to make clear its intent that a person registering to vote need not state his political affiliation, be it a party preference or nonpartisan.  Thus, the change from the current system is only in the fact that a voter's party preference or political affiliation need no longer be revealed.

I 1978 Proceedings 1025 (Comm. of the Whole Rep. No. 16); *see also id.* at 996 ("The people of Hawaii have indicated by polls that they favor a system that will not violate their privacy and not force them to reveal a political preference before being allowed to vote.") (Minority Rep. No. 13).

Consistent with this view, in addressing the constitutionality of a Connecticut closed primary law, *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208 (1986), observed: "Considered from the standpoint of the Party itself, the act of formal enrollment or public affiliation with the Party is merely one element in the continuum of participation in Party affairs, and need not be in any sense the most important."  *Id.* at 215.  It then noted:  "Indeed, acts of

(continued...)

The Hawaii Legislature implemented the constitutional amendment in

1979 by amending HRS § 12-31, which now provides:

> No person eligible to vote in any primary or
> special primary election shall be required to state a party
> preference or nonpartisanship as a condition of voting.
> Each voter shall be issued the primary or special primary
> ballot for each party and the nonpartisan primary or
> special primary ballot.  A voter shall be entitled to vote
> only for candidates of one party or only for nonpartisan
> candidates.  If the primary or special primary ballot is
> marked contrary to this paragraph, the ballot shall not be
> counted.
>      In any primary or special primary election in the
> year 1979 and thereafter, a voter shall be entitled to select
> and to vote the ballot of any one party or nonpartisan,
> regardless of which ballot the voter voted in any
> preceding primary or special primary election.

*See* 1979 Haw. Sess. L. Act 139, § 9 at 317.  "The first open primary [in Hawaii]

was in 1980.  Hawaii's primary has been open ever since."  Doc. No. 16-1, Nago

Decl. ¶ 6.  "When the primary is conducted, voters must indicate on the primary

ballot which party primary they are participating in.  If they attempt to cast votes

for any other party, those votes will not be counted."  *Id.* ¶ 19.

The DPH claims that these provisions requiring an open primary are

facially unconstitutional because allowing voters to "associate" anonymously with

---

[3](...continued)
public affiliation may subject the members of political organizations to public hostility or
discrimination; under those circumstances an association has a constitutional right to protect the
privacy of its membership rolls."  *Id.* at 215 n.5 (citations omitted).

a political party violates a party's First Amendment right of free association.  The

open primary conflicts with the DPH's formal policy that "prefers a nomination

electorate composed of its members, and other voters, even if they are not

members, who are supportive of the DPH and are willing to publicly declare their

affiliation with it."  Doc. No. 4-1 at 16, Pl.'s Mot. at 11.  To this end, the DPH has

certified and adopted the following provision in its constitution:[4]

> The Democratic Party of Hawaii shall be open to all
> persons who desire to support the Party, who wish to be
> known as Democrats, and who live in Hawaii.
>
> The Democratic Party of Hawaii believes that its primary
> election, a state-imposed mandatory nomination
> procedure, ought to be open to participation of only such
> persons as are willing to declare their affiliation with and
> support for the Party, either through public registration to
> vote, or through maintenance of membership in the Party.
> The Party further believes that the current Constitution
> and laws of the State of Hawaii, by maintaining secrecy
> of affiliation, and by compelling the Party to admit to its
> nomination procedures those who may have no interest
> in, or actually oppose the interests, values, and platform
> of the Party, do violence to the Party's associational
> freedoms and the individual freedoms of its membership
> to define their own political views, guaranteed under the
> Constitution of the United States.  The State Central
> Committee and Party Chairperson shall take appropriate
> action to correct this injustice.

---

[4]  The provision was certified by the DPH "State Central Committee on July 28, 2012," although the second paragraph "was adopted by the Convention of the DPH on May 27, 2006." Doc. No. 4-2, Carpenter Decl. ¶ 4.

Doc. No. 4-2, Carpenter Decl. ¶ 4.

According to its Chairperson, DPH membership records in 2005 showed approximately 20,000 members.  Doc. No. 13-1, Carpenter Suppl. Decl. ¶ 5.  "DPH membership had been in the 15,000 to 20,000 range for at least a decade before 2005, and possibly two decades or more."  *Id.* ¶ 6.  "In the period of the Obama-Clinton campaign for the 2008 election, DPH membership expanded dramatically."  *Id.* ¶ 10.  "Many persons joined the DPH in order to cast votes for one or the other in DPH meetings [that is, caucuses], held in early 2008.  DPH membership rose from approximately 20,000 to approximately 65,000."  *Id.*  In July of 2013, DPH membership was 65,461.  *Id.* ¶ 11.  "Memberships are normally not terminated by DPH unless the member resigns, is known to have died, is expelled for cause, or for a few other reasons.  Membership does not require the regular payment of dues, which are voluntary."  *Id.* ¶ 12.

## B.      Procedural Background

DPH filed this action on June 17, 2013.  Doc. No. 1.  In conjunction with the Complaint, the DPH filed a combined Motion for Partial Summary Judgment and Motion for Preliminary Injunction.[5]  Doc. No. 4.  On September 16,

---

[5]  During the October 7, 2013 hearing, the DPH explained that its summary judgment is "partial" only to distinguish proceedings on liability (*i.e.*, the constitutionality of Hawaii's open primary) from issues regarding a remedy, if the DPH succeeds in establishing that Hawaii law is

(continued...)

2013, the State filed its Opposition, and a Counter Motion for Summary Judgment. Doc. No. 15.  On September 23, the DPH filed a combined Reply as to its Motion, and Opposition to the State's Counter Motion, Doc. No. 19, and the State filed a Reply as to its Counter Motion on September 30, 2013.  Doc. No. 21.  The court heard oral argument on October 7, 2013.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

---

[5](...continued)
unconstitutional.

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

> "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

# IV. **DISCUSSION**

The DPH's challenge is limited to a *facial* attack on Hawaii's open primary.  Although its Complaint might be read more broadly, the DPH's memoranda in these Motions explicitly argue only that Hawaii's open primary provisions are facially unconstitutional, and the DPH made clear during oral argument that its action is only a facial -- not an "as applied" -- challenge.[6]  *See* Oct. 7, 2013 Tr. at 6 ("And that's my story and I'm sticking to it.").  The parties agree that there are no factual disputes on the record presented to the court, and that these Motions should resolve the constitutional issues before the court one way or the other -- if the court grants the State's Motion, then judgment should issue in its favor; and if the court grants the DPH's Motions, then only questions regarding an appropriate remedy would remain.  *Id.* at 7.  The court proceeds to address the facial challenge in this light.[7]

---

[6] In contrast to a facial attack, a "'paradigmatic' . . . as-applied challenge is one that 'tests' a statute's constitutionality in one particular fact situation while refusing to adjudicate the constitutionality of the law in other fact situations." *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) (citation and internal quotation marks omitted).  "An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

[7] The State concedes that a ruling in its favor on the facial challenge in this case would not preclude an "as-applied" challenge in later proceedings with a fully-developed evidentiary record.  Oct. 7, 2013 Tr. at 43-44.  This recognition is consistent with Ninth Circuit caselaw distinguishing facial and as-applied challenges -- in upholding a facial challenge to Arizona's

(continued...)

**A.    Legal Standards for Assessing Whether a State Election Law Imposes a Facially Unconstitutional Burden**

**_1.    A Facial Challenge -- "Unconstitutional in All of its Applications?" Or "A Plainly Legitimate Sweep?"_**

The parties offer differing standards for the court to apply.  The State requests that the court apply the "*Salerno* standard:"  A successful facial challenge to a law requires "'establishing that no set of circumstances exists under which the [law] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (internal brackets omitted); *see also id*. at 457 ("[A] facial challenge fails where 'at least some' constitutional applications exist.") (quoting *Schall v Maring*, 467 U.S. 253, 264 (1984)).  The DPH requests that the court apply a broader standard:  "While some Members of the Court have criticized the *Salerno* formulation, all agree that

---

[7](...continued)
Legal Worker Act, *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), commented:

> We uphold the statute in all respects against this facial challenge, but we must observe that it is brought against a blank factual background of enforcement and outside the context of any particular case.  If and when the statute is enforced, and the factual background is developed, other challenges to the Act as applied in any particular instance or manner will not be controlled by our decision.

*Id.* at 861 (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008)).

a facial challenge must fail where the [law] has a 'plainly legitimate sweep.'"  *Id.*

at 449 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997)

(Stevens, J., concurring)).  When addressing facial invalidity, courts "must be

careful not to go beyond the [law's] facial requirements and speculate about

'hypothetical' or 'imaginary' cases."  *Id.* (citations omitted).

Ultimately, the court's conclusion is not impacted by the choice

between these alternative formulations ("no set of circumstances" or "plainly

legitimate sweep").  That is, the court's ruling would be the same under either

standard.  *See United States v. Stevens*, 559 U.S. 460, 472 (2010) ("Which standard

applies in a typical case is a matter of dispute that we need not and do not address

[in this case.]").

Courts disfavor facial challenges for several reasons.  "Claims of

facial invalidity often rest on speculation.  As a consequence, they raise the risk of

'premature interpretation of statutes on the basis of factually barebones records.'"

*Wash. State Grange*, 552 U.S. at 450 (quoting *Sabri v. United States*, 541 U.S. 600,

609 (2004)).

> Facial challenges also run contrary to the fundamental
> principle of judicial restraint that courts should neither
> anticipate a question of constitutional law in advance of
> the necessity of deciding it nor formulate a rule of
> constitutional law broader than is required by the precise
> facts to which it is to be applied.

14

*Id.* (citations and internal quotation marks omitted).  Further, "facial challenges

threaten to short circuit the democratic process by preventing laws embodying the

will of the people from being implemented in a manner consistent with the

Constitution."  *Id.* at 451 (citations and internal quotation marks omitted).  That is,

"'[a] ruling of unconstitutionality frustrates the intent of the elected representatives

of the people.'"  *Id.* (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546

U.S. 320, 329 (2006)).  A challenger seeking to invalidate a statute "in all its

applications" bears a "heavy burden of persuasion."  *Crawford v. Marion Cnty.*

*Election Bd.*, 553 U.S. 181, 200 (2008).

### 2.     A "Severe Burden" on First Amendment Rights?

"The Constitution grants States broad power to prescribe the 'Times,

Places and Manner of holding Elections for Senators and Representatives,' Art. I,

§ 4, cl. 1, which power is matched by state control over the election process for

state offices."  *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (citations and some

internal quotations omitted).  Accordingly, "States have a major role to play in

structuring and monitoring the election process, including primaries."  *Cal.*

*Democratic Party v. Jones*, 530 U.S. 567, 572 (2000).  For example, "a State may

require parties to use the primary format for selecting their nominees, in order to

assure that intraparty competition is resolved in a democratic fashion."  *Id.*

(citations omitted).

But this does not mean that States are free to regulate all aspects of a primary election -- "when States regulate [a political] parties' internal processes they must act within limits imposed by the Constitution." *Id.* at 573.  In this regard, "the First Amendment, among other things, protects the right of citizens 'to band together in promoting among the electorate candidates who espouse their political views.'" *Clingman*, 544 U.S. at 586 (quoting *Jones*, 530 U.S. at 574). This freedom "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Jones*, 530 U.S. at 574 (quoting *Democratic Party of the U.S. v. La Follette*, 450 U.S. 107, 122 (1981)).  "That is to say, a corollary of the right to associate is the right not to associate." *Id.*  "Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *Id.* (quoting *La Follette*, 450 U.S. at 122 n.22).

And so, when considering a challenge to a state election law, the court must "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for

the burden imposed by its rule, taking into consideration the extent to which those

interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*,

504 U.S. 428, 434 (1992) (citations and quotation marks omitted).

"Election regulations that impose a *severe burden* on associational

rights are subject to strict scrutiny, and [courts] uphold them only if they are

'narrowly tailored to serve a compelling state interest.'" *Wash. State Grange*, 552

U.S. at 451 (quoting *Clingman*, 544 U.S. at 586) (emphasis added). "If a statute

imposes only modest burdens, however, then 'the State's important regulatory

interests are generally sufficient to justify reasonable, nondiscriminatory

restrictions' on election procedures." *Id.* (quoting *Anderson v. Celebrezze*, 460

U.S. 780, 788 (1983)).

In short, the court must assess whether Hawaii's open primary

necessarily and facially "severely burdens" a political party's First Amendment

right to free association.  If so, then the court will uphold the open primary

provisions only if they are narrowly tailored to meet compelling state interests.

The analysis changes, however, if the burden is not "severe."  Rather, "lesser

burdens will be upheld as long as they are justified by a state's important

regulatory interests." *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1177

(9th Cir. 2008) (citations and quotation marks omitted).

B.      **Application of Legal Standards**

1.      ***The DPH's Arguments***

The DPH, relying primarily on *Jones*, argues that Hawaii's open

primary violates a party's -- *any* party's -- First Amendment associational rights

because a party is, or can be, forced to "associate" with anonymous voters who do

not share its views, and such voters should not have a say in a party's selection of

its nominees.  *See Jones*, 530 U.S. at 574 ("In no area is the political association's

right to exclude more important than in the process of selecting its nominee.").

*Jones* emphasizes that the associational right is particularly important in this

context because the nomination process "often determines the party's positions on

the most significant public policy issues of the day, and even when those positions

are predetermined it is the nominee who becomes the party's ambassador to the

general electorate in winning it over to the party's views."  *Id*. at 575 (citing

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 372 (1997) (Stevens J.,

dissenting)).  It is "the crucial juncture at which the appeal to common principles

may be translated into concerted action[.]"  *Id*. (quoting *Tashjian v. Republican

Party of Conn.*, 479 U.S. 208 216 (1986)).  And thus Supreme Court "cases

vigorously affirm the special place the First Amendment reserves for, and the

special protection it accords, the process by which a political party 'selects a

18

standard bearer who best represents the party's ideologies and preferences.'" *Id.*

(quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)).

       *Jones* struck as unconstitutional a California blanket primary system

in which a primary ballot listed "every candidate regardless of party affiliation and

allow[ed] the voter to choose freely among them." *Id.* at 570.  A California

primary voter was not required to affiliate in any manner with a party before voting

for that party's candidate.  Such a blanket primary thus "force[d] political parties to

associate with -- to have their nominees, and hence their positions, determined by -

- those who, at best, have refused to affiliate with the party, and, at worst, have

expressly affiliated with a rival." *Id.* at 577.  *Jones* characterized such a blanket

primary as "qualitatively different from a closed primary [where] even when it is

made quite easy for a voter to change his party affiliation the day of the primary,

and thus, in some sense, to 'crossover,' at least he must formally *become a member

of the party;* and once he does so, he is limited to voting for candidates of that

party." *Id.*

       *Jones* relied on evidence (for example, statistical surveys of past

primary elections, and expert witness testimony) establishing a "clear and present

danger" that a party's nominee could be "determined by adherents of an opposing

party." *Id.* at 578.  Moreover, statistics demonstrated that "[t]he impact of voting

by non-party members is much greater upon minor parties." *Id.* And the record supported that "these substantial numbers of voters who help select the nominees of parties they have chosen not to join often have policy views that diverge from those of the party faithful." *Id.*

Further, the evidence indicated that "the deleterious effects" were "not limited to altering the identity of the nominee" -- the blanket primary actually forced nominees to change their message and views. *Id.* at 579. Indeed, it was "the whole *purpose* of [the blanket primary] . . . to favor nominees with 'moderate' positions. It encourages candidates -- and officeholders who hope to be renominated -- to curry favor with persons whose view are more 'centrist' that those of the party base." *Id.* at 580. The blanket primary forced parties "to adulterate their candidate-selection process . . . by opening it up to persons wholly unaffiliated with the party." *Id.* at 581. It "ha[d] the likely outcome -- indeed . . . the *intended* outcome -- of changing the parties' message." *Id.* Such a severe burden was not justified by the interests proffered as "compelling" by California, *id.* at 582-85, and was not "narrowly tailored" to further them. *Id.* at 586.

The DPH likens Hawaii's open primary to the blanket primary that *Jones* struck down. Because a party has no other option but to nominate candidates by primary, *see* HRS § 12-1, the DPH contends that a party is powerless

20

to exclude, for example, (1) those who are indifferent to its beliefs; (2) those whose interest in the party is "fleeting or transient, or a matter of momentary convenience or accident;" (3) "adherents of opposing parties;" or (4) those "who have worked to undermine and oppose" the party. Doc. No. 4-1, Pl.'s Mot. at 15. It argues that "Hawaii voters can nominate the candidates of [] political organization[s] they would, as matter of conscience, refuse to join, and by which, in a reciprocal exercise of conscience, they would be rejected." *Id.* at 16. The DPH thus concludes that (1) the open primary imposes a severe burden, and is facially unconstitutional as a matter of law; and (2) the DPH suffers irreparable harm, and the public interest therefore favors the entry of a preliminary injunction preventing Nago from enforcing and applying Hawaii's open primary provisions. *Id.* at 29-30.[8]

---

[8] The DPH also relies on *La Follette*, which struck a Wisconsin open primary provision as inconsistent with a Democratic National Party rule providing that "only those who are willing to affiliate publicly with the Democratic Party may participate in the process of selecting delegates to the Party's National Convention" for selection of a Presidential candidate. 450 U.S. at 109. *La Follette*, however, did not decide that Wisconsin's open primary itself was facially unconstitutional, and did not address its application outside of a Presidential nomination process. Indeed, it suggested that an "open" feature might itself be permissible:

> The Wisconsin Supreme Court considered the question before it to be the constitutionality of the 'open' feature of the state primary election law, as such. Concluding that the open primary serves [a] compelling state interest by encouraging voter participation, the court held the state open primary constitutionally valid. Upon this issue, the Wisconsin Supreme Court may well be correct.

(continued...)

The DPH's challenge fails for two reasons.  First, even if *Jones* applies to this open primary challenge, there are realistic factual situations that would not "severely" burden *other* parties' associational rights -- and thus, given legitimate and important state interests, the open primary is not "unconstitutional in all of its applications."  *Wash. State Grange*, 552 U.S. at 449.  Second, the DPH has failed to *prove* a severe burden -- "*Jones* treated the risk that nonparty members will skew either primary results or candidates' positions as a *factual* issue, with the plaintiffs having the burden of establishing that risk."  *Ariz. Libertarian Party v. Bayless*, 351 F.3d 1277, 1282 (9th Cir. 2003) (emphasis added).  Proving a severe burden must be done "as-applied," with an evidentiary record, and the current record is simply insufficient.  *Wash. State Grange*, 552 U.S. at 457-58.  The court explains these two reasons more fully below.

## 2.    *A Purely Facial Challenge Fails*

The DPH's facial challenge is premised on the open primary being a severe burden *per se*.  And in doing so, the DPH emphasizes its own party "preference" (adopted into the DPH Constitution) to have voters who are willing to declare their affiliation with the DPH publicly.  Its formal policy is that it should

---

[8](...continued)
*Id.* at 120-21.

22

not be compelled to affiliate, in the nomination process, with persons "who may have no interest in, or actually oppose the interests, values, and platform" of the DPH.  Doc. No. 4-2, Carpenter Decl. ¶ 4.  The DPH thus argues that, under *Jones*, it is "severely" burdened by being forced to associate with those who do not share its values (or by being forced to associate with those whose values it does not know).[9]

Initially, it is far from clear the extent to which *Jones*' holding (arising from a blanket primary) applies to an open primary.  Indeed, *Jones* stated that California's prior blanket primary was "qualitatively different" from a closed primary system where it may be "made quite easy for a voter to change his party

---

[9]  The DPH makes much of the mandatory nature of Hawaii's open primary.  That is, unlike in some other states with open primaries, Hawaii law does not allow a party to "opt out" and nominate a general election candidate by other means.  *See* HRS §§ 12-1, 12-2.  Other courts have relied on such an "opt out" possibility to uphold (facially) an open primary against a forced association constitutional challenge under *Jones*.  *See Miller v. Brown*, 503 F.3d 360, 367 (4th Cir. 2007) ("[W]e need not decide whether Virginia's open primary statute, viewed in isolation, impermissibly burdens a political party's right to associate with those who share its beliefs. . . . Virginia allows political parties to nominate candidates not only by state-run primary but also by other methods controlled and funded by the party.  And, by merely choosing any of these other options, a party is free to limit its candidate selection process to voters who share its political views.  Thus the 'forced association' that the Supreme Court has condemned [in *Jones*] simply is not present here."); *Greenville Cnty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 655, 664 (D.S.C. 2011) ("[C]ourts have repeatedly rejected attempts to facially attack state election statutes on the basis of forced association where state law provides legitimate alternatives that do not restrict freedom of association.").

Nevertheless, it is "too plain for argument" that "a State may *require* parties to use the primary format for selecting their nominees[.]"  *Jones*, 530 U.S. at 572 (emphasis added).  And the lack of an alternative does not necessarily mean the open primary requirement is facially unconstitutional under *Jones*.

23

affiliation the day of the primary, and thus, in some sense, to 'cross over'[.]" 530

U.S. at 577.  In such a system, "at least [the voter] must formally *become a*

*member of the party;* and once [the voter] does so, he is limited to voting for

candidates of that party."  *Id.*  And, in this particular sense, such a closed primary

may be virtually indistinguishable from Hawaii's open primary where voters can

"affiliate" with a party on the day of the primary.  In fact, *Jones* distinguished an

open primary system from California's blanket primary system:

> In this sense, the blanket primary also may be
> constitutionally distinct from the open primary . . . in
> which the voter is limited to one party's ballot.  *See La
> Follette*, [450 U.S.] at 130, n.2 (Powell, J., dissenting)
> ("[T]he act of voting in the Democratic primary fairly
> can be described as an act of affiliation with the
> Democratic Party. . . .  The situation might be different in
> those States with 'blanket' primaries -- i.e., those where
> voters are allowed to participate in the primaries of more
> than one party on a single occasion, selecting the primary
> they wish to vote in with respect to each individual
> elective office").  This case does not require us to
> determine the constitutionality of open primaries.

*Id.* at 577 n.8.

Even applying *Jones*' reasoning here, however, the DPH's facial

challenge necessarily raises other parties' perspectives, an issue not squarely

addressed in *Jones*.[10]  At its core, *Jones* found the blanket primary process

unconstitutional because it "adulterated" the process by opening the primary "to

persons wholly unaffiliated with the party."  *Id.* at 581.  But another party

(particularly a smaller and less recognized party) might well have a preference

different from the DPH's.  Another party might happily embrace any voter willing

to affiliate with it in any manner -- even voters affiliating anonymously in the

privacy of the ballot booth.  Another party might adopt a formal policy to welcome

voters with diverse views -- even those that might differ from a party's public

campaign positions.  A party with such policies would not be forced to change its

message at all, as was central to the reasoning in *Jones*.  530 U.S. at 579-80.  These

possibilities are far from hypothetical or speculative.

In *Clingman*, for example, the Libertarian Party of Oklahoma ("LPO")

*wanted* to open its primary to all registered voters regardless of party

affiliation, whether Republican, Democratic, Reform, or independent.  544 U.S. at

581.  "[T]he LPO [was] happy to have their votes, if not their membership on the

party rolls."  *Id*. at 589.[11]  And in *Tashjian*, the Republican Party of Connecticut

---

[10]  *Jones* was brought by a coalition of parties across the political spectrum (the
California Democratic, Republican, and Libertarian Parties, and the Peace and Freedom Party).
530 U.S. at 571.

[11]  *Clingman* ultimately upheld Oklahoma's semiclosed primary, under which a political
(continued...)

adopted a rule *permitting* independent voters to vote in Republican primaries for federal and state offices, 479 U.S. at 210, "[m]otivated in part by the demographic importance of independent voters in Connecticut politics."  *Id*. at 212.

*Tashjian* found unconstitutional a Connecticut closed primary that required voters in any primary to be registered as party members, contrary to the Republican Party of Connecticut's rule inviting independents to vote in its primaries.  The Supreme Court reasoned that the closed primary "impermissibly burdens the right of [the party's] members to determine for themselves with whom they will associate, and whose support they will seek, in their quest for political success."  *Id*. at 214.  "The Party's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association."  *Id*.  Although *Tashjian* addressed a closed primary, it demonstrated that the constitutional analysis in a primary election law challenge -- whether a state's primary system "severely burdens" a party's associational rights -- depends fundamentally on the party's *own* views as to who it wants to associate with because it is "the right of [a party's] members to determine

_____

[11](...continued)
party could invite only its own registered members and registered independents to vote in its primary.  544 U.S. at 590.  Such a system did not severely burden either a voter's or the LPO's associational rights because voters (even those already registered with another party) could have affiliated with the LPO "with only nominal effort" and were "not 'locked in' to an unwanted party affiliation."  *Id*. at 590-91.

for themselves with whom they will associate." *Id.*

The DPH disagrees that the burden turns on a party's policy or desires, contending that an unconstitutional law is still unconstitutional even if one embraces it. The DPH argues that "[a] political party that prefers the 'open' primary suffers a lack of liberty by having no other choice." Doc. No. 19, Pl.'s Reply at 10. "[A] citizen may not want to stand in a public forum and make political speeches, but being prohibited from doing so is still a loss of liberty." *Id.* But the DPH's logic assumes too much. The right at issue is the right to associate, which includes the corollary right *not* to associate. And although the DPH may not want to associate with non-members, other parties may embrace association with anyone -- party members or not -- willing to vote in that party's primary. Another party, as in *Tashjian*, may want to "broaden the base of public participation" in its primary," 479 U.S. at 214, and thus it would have no "asserted injury" under the First Amendment. *Burdick*, 504 U.S. at 434. Put differently, a party (particularly small parties) welcoming all voters would not face any burden on its associational rights, and the open primary would be fully consistent with *its* right to associate.

Consequently -- regardless of which test for facial invalidity ("no set of circumstances" or "plainly legitimate sweep") is proper here -- there are realistic (perhaps even likely) factual situations where a party's associational rights would

27

not be "severely" burdened by Hawaii's open primary.  Given a lesser burden, the open primary is clearly supported by important and legitimate State rights such as protecting the privacy of a person's vote, and encouraging voter participation by removing barriers to vote.  *See, e.g.*, *Clingman*, 544 U.S. at 593 ("When a state electoral provision places no heavy burden on associational rights, a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.") (citations and internal quotation marks omitted).  In short, the open primary has a "plainly legitimate sweep."  *Wash. State Grange*, 552 U.S. at 449.  There are "at least some" constitutional applications of Hawaii's open primary.  *Id.* at 457.  And it is not "unconstitutional in all of its applications."  *Id.* at 449.  Therefore, the DPH's purely facial challenge to Hawaii's open primary fails.

### 3.    *An Evidentiary Record Is Necessary*

The DPH's challenge fails for a second, independent reason -- the court cannot measure whether the burden is severe (or not) without proof -- and proof requires an evidentiary record.

The DPH argues that this court can address its facial First Amendment challenge after ensuring "that there are no troublesome facts hidden beneath the surface, so that the claim really can be decided on the record" and after making

certain that "there truly is but one avenue for its application." Doc. No. 19, Pl.'s

Reply at 8. It asserts that the open primary is unconstitutional by emphasizing the

primary's impact on its own policies (although not explicitly challenging the

primary "as applied" only to the DPH). But even given the DPH's interpretation of

a "facial challenge," and even if the court could address the DPH's challenge

without looking to the possible impact on other parties, the court cannot -- on the

present record -- assess whether the DPH's associational rights have been burdened

without considering evidence as to the extent, if any, of that burden.

     *Jones* determined that California's blanket primary constituted a

"clear and present danger" that a party's nominee would be "determined by

adherents of an opposing party," but it did so based on *evidence*. 530 U.S. at 578.

For example, the court had data quantifying the percentage and characteristics of

likely "cross over" voters, and considered testimony measuring the likely impact of

unaffiliated voters. *Id.* at 578-79. Expert opinions, surveys, and statistical data of

prior elections indicated that the blanket primary had the intended effect of

"changing the parties' message." *Id.* at 580-82. And historical evidence revealed

that the blanket primary was adopted by voter initiative, "[p]romoted [by

California] largely as a measure that would 'weaken' party 'hard-liners' and ease

the way for 'modern problem-solvers.'" *Id.* at 570.

Recognizing that *Jones* relied on evidence to establish the burden on those political parties, *Bayless* subsequently held that a challenge to a primary election (and in particular, the severity of the burden on a party's associational rights) raised a factual issue that must be proven.  351 F.3d at 1282.  In reviewing a facial challenge to the constitutionality of an Arizona primary election system, *Bayless* reasoned:[12]

> The district court . . . erred in failing to consider separately whether the participation of nonmembers in the selection of candidates is constitutional under [*Jones*].  Although forcing the Libertarians to open their primary to nonmembers for the selection of party candidates raises serious constitutional concerns, *we concludes that the resolution of the constitutional issue turns on factual questions* not decided by the district court.  We therefore remand so that the district court may consider the severity of the burden this aspect of the primary system imposes on the Libertarian Party's associational rights, [and] whether the state has sufficiently justified that burden[.]

*Id.* (emphasis added).  It explained that

> *Jones* treated the risk that nonparty members will skew either primary results or candidates' positions *as a factual issue*, with the plaintiffs having the burden of establishing that risk.  On remand, the district court should separately consider the constitutionality of

---

[12]  *See Ariz. Libertarian Party, Inc. v. Bd. of Supervisors of Pima Cnty.*, 216 F. Supp. 2d 1007, 1009 (D. Ariz. 2002) ("Plaintiffs raise a facial challenge to the open primary election law in Arizona and are not challenging how that law is applied specifically to the Libertarian Party in Pima County.") (district court decision reversed by *Bayless*).

> nonparty members voting for Libertarian party
> candidates for public office, including the primary
> system's potential to change the party's nominee or the
> candidates' positions.

*Id.* (emphasis added).

And in a subsequent election law challenge (after *Washington State Grange*), *Crawford* reemphasized the inherently factual nature of the relevant inquiry. Referring to the "heavy burden" necessary to invalidate an election law "in all its applications," *Crawford* reiterated that a court errs by "fail[ing] to give appropriate weight to the magnitude of that burden when [analyzing] a preelection facial attack on . . . primary election procedures." 553 U.S. at 200 (citing *Wash. State Grange*, 552 U.S. at 442). *Crawford* upheld an Illinois voter registration law, reasoning in part that the evidentiary record was insufficient: "[O]n the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on [an identified] narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id.* Given an insufficient record in that facial challenge, *Crawford* could "not conclude that the statute imposes 'excessively burdensome requirements' on any class of voters." *Id.* at 202.

Under this precedent, this court cannot consider the DPH's challenge without analyzing proof of a burden. *See also Alaskan Independence Party*, 545 F.3d at 1180-81 (rejecting a facial challenge to an Alaska primary election law

31

because the record did not demonstrate that the law conflicted with a party's specific bylaws); *Idaho Republican Party v. Ysura*, 660 F. Supp. 2d 1195, 1201 (D. Idaho 2009) (requiring "an evidentiary hearing or trial" to determine whether Idaho's open primary violated the Idaho Republican Party's associational rights, given a lack of evidence as to "whether and to what extent 'crossover voting' exists in Idaho, and whether and to what extent the threat of such 'crossover' voting affects the message of [that party] and its candidates").[13] *Cf. Greenville Cnty. Republican Party v. South Carolina*, 824 F. Supp. 2d 655, 665 (D.S.C. 2011) ("[*Jones*] is additionally distinguishable in that the lower court and the appellate courts reviewing California's blanket primary law evaluated the law after benefit of a trial which focused, substantially, on testimony regarding the effects of cross-over voting.  There is no similar empirical evidence before the court today[.]").

The DPH simply asserts that it will be, or can be, forced to "associate" with voters who are "adherents of opposing parties," and "who have worked to

---

[13] *Idaho Republican Party v. Ysursa*, 765 F. Supp.2d 1266 (D. Idaho 2011), later determined that Idaho's open primary was unconstitutional, but did so on an as-applied basis after a bench trial. *See id.* at 1277 (finding the Idaho open primary statute "is unconstitutional *as applied* to the Idaho Republican Party") (emphasis added).  On appeal, the Ninth Circuit vacated the district court's judgment with instructions to dismiss the case as moot, after Idaho's legislature changed its primary system. *See Idaho Republican Party v. Ysursa*, No. 11-35251 (9th Cir. Sept. 19, 2011) (Order granting Appellees' Motion to Dismiss Appeal).

undermine and oppose" the DPH.  Doc. No. 4-1, Pl.'s Mot. at 15.  The court, however, cannot assume (1) that such "non-adherents" have burdened the DPH by voting in a Democratic primary in the past, (2) that DPH candidates have in fact been forced to change their message to cater to these non-DPH voters, much less (3) that the DPH has been "severely" burdened over the past thirty-three years that Hawaii has had an open primary.

Of course, it is *possible* (even likely) that some "crossover" voters (*i.e.*, members of, or sympathizers with, a rival party) have temporarily affiliated with the DPH by voting Democrat in a Hawaii primary election.  But it is also *possible* (even likely) that -- given Hawaii's demographics[14] -- a large percentage of primary voters who were not formally registered with the DPH, but who affiliated with it by voting in a Democratic primary, fully considered themselves to be Democrats, and thus were *not* working to "undermine and oppose" the DPH.  And if Hawaii primary election voters choosing a Democratic ballot have views

---

[14]  Both the DPH and the State agree as a matter of common knowledge that Hawaii is a heavily Democratic State.  *See, e.g.*, Doc. No. 15-1, Def.'s Counter-Mot. at 8; Doc. No. 19, Pl.'s Reply at 4.  This fact is supported by publicly-available polls -- according to an August 3, 2012 Gallup poll, "[a]long with the District of Columbia, Rhode Island and Hawaii rank as the most Democratic states in the country[.]"  L. Saad, *Heavily Democratic States Are Concentrated in the East* (Aug. 3, 2012), available at http://www.gallup.com/poll/156437/heavily-democratic-states-concentrated-east.aspx (last visited Nov. 14, 2013).  As an example, Hawaii's current State Senate consists of twenty four Democrats and one Republican, and its House consists of forty four Democrats and seven Republicans.  *See* http://www.capitol.hawaii.gov/members/ legislators.aspx?chamber=S (last visited Nov. 14, 2013).

that *completely agree* with the DPH's platform, then the DPH is not being forced to associate with those who are antithetical to its views. The DPH would likely not be "severely" burdened by not being able to reject persons who fully embrace its values. The possibility of crossover voters might make no difference.[15]

Even if anonymity creates *some* burden to the DPH, the court cannot *assume* -- without a developed evidentiary record -- that the DPH is *severely* burdened (as opposed to being merely inconvenienced) by such a system, especially a system adopted specifically to protect privacy of the vote and to encourage voter participation. And the current record in this case establishes no more than that the DPH has a formal preference to associate with those who are willing to publicly declare their support for the DPH, and that approximately 65,000 people have formally registered with the DPH in a heavily Democratic state with a population of over one million people.

In short, the DPH's arguments rest on assumptions about voter behavior that cannot be judged without evidence. The DPH's challenge thus fails for this second reason. *See Wash. State Grange*, 552 U.S. at 457 ("Each of [the

---

[15] "It may be the case, of course, that the public avowal of party affiliation . . . provides no more assurance of party loyalty than does [a] requirement that a person vote in no more than one party's primary. But the stringency, and wisdom, of membership requirements is for the association and its members to decide -- not the court -- so long as those requirements are otherwise constitutionally permissible." *La Follette*, 450 U.S. at 123 n.25.

challenger's] arguments rests on factual assumptions about voter confusion, and each fails for the same reason:  In the absence of evidence, [a court] cannot assume that . . . voters will be misled.").  Just as in *Washington State Grange*, such a factual determination "must await an as-applied challenge."  *Id.* at 458.[16]  Having failed to succeed on the merits, it follows that the DPH's request for a preliminary injunction also fails.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

---

[16]  The DPH relies on *Democratic Party of Washington v. Reed*, 343 F.3d 1198 (9th Cir. 2003), which, in addressing a facial challenge to Washington's former blanket primary, characterized *Jones* as determining that California's blanket primary statutes "on their face" restricted free association and only looked "at the evidence to determine whether the state satisfied its burden of showing narrow tailoring toward a compelling state interest."  *See id.* at 1203 ("[*Jones*] does not set out an analytic scheme whereby the political parties submitted evidence establishing that they were burdened.  Instead, *Jones* infers the burden from the face of the blanket primary statutes.").  Regardless of how *Reed* may characterize it, *Jones* reviewed a district court's findings of fact and conclusions of law after four days of testimony, *see Cal. Democratic Party v. Jones*, 984 F. Supp. 1288, 1292-93 (E.D. Cal. 1997), *aff'd* 169 F.3d 646 (9th Cir. 1999), *rev'd*, 530 U.S. 567 (2000), and relied on this well-developed factual record at all stages of the strict scrutiny analysis.  In any event, the court is persuaded by *Bayless*, which the Ninth Circuit decided several months after *Reed*, and is completely consistent with later-decided Supreme Court precedent, *Washington State Grange* and *Crawford*, as detailed above.

# V.  CONCLUSION

For the foregoing reasons, the court upholds Hawaii's open primary against the Democratic Party of Hawaii's facial constitutional challenge.  The DPH has failed to prove that the open primary is facially unconstitutional.  Accordingly, the court DENIES the DPH's Motion for Partial Summary Judgment and Motion for Preliminary Injunction, Doc. No. 4, and GRANTS the State's Counter Motion for Summary Judgment.  Doc. No. 15.  Judgment shall enter in favor of the State, and the Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 14, 2013.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Democratic Party of Haw. v. Nago*, Civ. No. 13-00301 JMS-KSC, Order (1) Denying Plaintiff's Motion for Summary Judgment; (2) Denying Plaintiff's Motion for Preliminary Injunction; and (3) Granting Defendant's Motion for Summary Judgment